STATE OF NEBRASKA, APPELLEE, V.
WILLIAM C. FLOYD, JR., APPELLANT.
725 N.W.2d 817

Filed January 12, 2007. No. S-05-1376.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## I. NATURE OF CASE

William C. Floyd, Jr., was convicted in the district court for Douglas County of first degree murder, manslaughter of an unborn child, and being a felon in possession of a firearm. He was sentenced to life imprisonment on the murder conviction, to a consecutive sentence of 20 to 20 years' imprisonment on the manslaughter conviction, and to a concurrent sentence of 20 to 20 years' imprisonment on the possession of a firearm conviction. The charges against Floyd arose from the shooting death of Destiny Davis, who was pregnant at the time of her death. Floyd appeals his convictions. We affirm Floyd's conviction for being a felon in possession of a firearm, but we reverse Floyd's convictions for first degree murder and manslaughter of an unborn child and remand the cause for a new trial on those charges.

## II. STATEMENT OF FACTS

On July 30, 2004, the State charged Floyd with first degree murder and manslaughter of an unborn child in connection with the October 7, 2003, shooting death of Davis, who was pregnant at the time of the shooting. The information against Floyd was subsequently amended to include a charge that Floyd was a felon in possession of a firearm. Floyd was also charged with two counts of first degree assault on two other individuals, but the assault charges were subsequently dismissed pursuant to Floyd's plea in abatement.

On the evening of October 7, 2003, Davis and several other individuals, including Davis' sister, Shantelle Vickers, were inside a home located in Omaha, Nebraska. Shortly before 10:30 p.m., Vickers went to the bathroom to prepare to take a bath, while Davis and the other individuals remained in the living room. While in the bathroom, Vickers heard shots. The shots were fired from outside through the living room window, and Davis and two others were hit. Davis died; the two other individuals were wounded but did not die. Vickers testified at trial that after hearing the shots, she looked out a window and saw a man she identified as Floyd outside the house.

Trial in this case began with jury selection on May 16, 2005. After jurors were chosen but before the jury was sworn, Floyd

raised a challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to peremptory strikes the State had used against two prospective jurors. The parties agreed that Floyd and the two prospective jurors were African-American. Floyd acknowledged that a third prospective juror who was African-American was not struck and remained on the jury. The court determined that Floyd had made a prima facie showing that strikes had been used on the basis of race and put the burden on the State to articulate race-neutral explanations for its strikes. The State asserted that the first prospective juror had been stricken because he testified that he had read about the shooting in the newspaper, that he had friends who had talked about the shooting, and that he thought he had a friend who was a friend of one of the shooting victims. The State also noted that the first prospective juror testified that he was scheduled to take a civil service examination the next Tuesday. With regard to the second prospective juror, the State noted that the juror had testified that he had attended a Christian academy. Prosecutors stated that they did not want a juror who might have a "judge not lest you be judged type mentality." The court determined that the State's explanations were race-neutral and concluded that Floyd had not carried his burden of proving purposeful discrimination. The court denied Floyd's *Batson* challenge, and the trial proceeded.

The State's theory at trial was that Floyd shot through the window with the intent to shoot Vickers rather than Davis. Prior to trial, the State filed a motion pursuant to Neb. Rev. Stat. § 27-404(3) (Reissue 1995), seeking to admit evidence of previous assaults and threats Floyd had made against Vickers in the months and days prior to the shooting. The court determined that evidence of certain prior incidents was admissible for the purposes of establishing motive, intent, plan, and absence of mistake or accident.

Vickers testified at trial, and the State questioned her regarding the incidents. Floyd objected to most of the State's questioning, but he did not object to testimony regarding threatening telephone calls Floyd had made to Vickers on the night of the shooting. The court overruled Floyd's objections. After Floyd's first objection, the court instructed the jury that it could

consider the evidence for the limited purpose of deciding whether Floyd "had the motive, intent or plan to commit the acts for which he stands charged, or the absence of mistake or accident," but not for any other purpose "such as bad character or propensity." As subsequent testimony was admitted over Floyd's objections, the court referred the jury back to the limiting instruction, and the instruction was later repeated. In connection with Vickers' testimony regarding one of the prior incidents, the State offered into evidence an exhibit that included a protection order Vickers had obtained against Floyd. Attached to the protection order was a petition and affidavit in which, inter alia, Vickers described the acts Floyd had committed against her. The court allowed a redacted version of the exhibit to be admitted, over Floyd's objections.

During the course of the trial, evidence was presented which related to certain issues, including the charge that Floyd was a felon in possession of a firearm. In this regard, a former girl friend of Floyd's testified that Floyd had shown up at her house on the night of the shooting. She testified that at one point, Floyd "stood up and a gun fell out [of] his pocket." She described the gun as a semiautomatic, and she testified that Floyd said he had the gun "for protection." The State also entered into evidence a certified record showing that in 1997, Floyd had been convicted of felony criminal mischief and was sentenced to 1 to 2 years' imprisonment.

Closing arguments were presented to the jury on May 20, 2005. At the beginning of the State's closing argument, the prosecutor stated, "The evidence has proved that . . . Floyd is a murderer, that's what it proved, and if I don't have the courage to look him in the eye and call him what he is, I don't have the right to ask you to do the same." Floyd immediately objected to the prosecutor's statement and moved for a mistrial. The court instructed the jury "to disregard the last comment about the prosecutor's opinion and not be influenced by any statements of counsel not supported by the evidence." In a sidebar conference, the court warned that the prosecutor's statement was "very close" to an opinion but overruled Floyd's motion for a mistrial. The court then repeated its instruction to the jury "to disregard the last remark by the prosecutor when he pointed to

[Floyd]." The court noted that the members of the jury were "all nodding in the affirmative." The State resumed its closing argument, and the prosecutor almost immediately said, "Why does the State think it has proven . . . Floyd to be guilty of —." Before the prosecutor completed the sentence, Floyd objected. The court sustained the objection and instructed the jury to disregard the statement. The prosecutor then stated to the jury, "What I'm trying to say is let's look at what the evidence has shown us, all right? Motive. Why is . . . Davis dead? Why do we think . . . Floyd did it? Why are we here?" Floyd again objected, and the court again sustained the objection and instructed the jury to disregard the statement. Floyd renewed his motion for a mistrial; the court overruled the motion and instructed the jury to disregard any reference to the prosecutor's opinion. The State continued its closing argument, and some time into the argument, the prosecutor stated, "If you believe — and it is not an element of proof that the State has to prove where the shots were fired from, but I don't see how reasonable minds could differ." Floyd objected "to the personal opinion," and the court sustained the objection and instructed the jury to disregard the prosecutor's personal opinion. Floyd did not at that time renew his motion for a mistrial.

After Floyd presented his closing argument and the court gave its instructions, the jury began deliberations on Friday, May 20, 2005. On the morning of Tuesday, May 24, the jury was reassembled in open court. The foreperson of the jury stated that the jury could not come to a unanimous decision and indicated that the split of votes was 11 to 1. After discussion with counsel, the court instructed the jury to return to the jury room to continue deliberations. That afternoon, the jury returned to the courtroom and the foreperson stated that the jury had reached a verdict. The judge read a verdict finding Floyd guilty on all three counts. Floyd requested that the jury be polled. As the court polled the jury, each juror was asked whether the verdict of guilty was his or her verdict as to each count. Eleven of the jurors answered "[y]es" as to each count. When juror J.K. was asked whether her verdict was guilty as to each count, with respect to the count of first degree murder, she answered, "Probably," with respect to the count of manslaughter of an

unborn child, she replied, "I don't know," and with respect to the count of felon in possession of a firearm, she replied, "Yes." After conferring with counsel, the court returned to questioning J.K. and told her that in order to be certain the court understood her responses, she would need to reply either "yes" or "no." With respect to the count of felon in possession of a firearm, J.K. again replied, "Yes"; however, with respect to the counts of first degree murder and manslaughter of an unborn child, J.K. responded, "No." The court directed the jury to return to the jury room and continue its deliberations.

Later that afternoon, Floyd moved for a mistrial on the basis that he had appeared before the jury in shackles during the proceeding in which the jury was polled as to its verdict. Floyd conceded that he had not been displayed in shackles at any prior point of the trial, but he argued that because the jury continued deliberations after that proceeding, his appearance in shackles was unduly prejudicial. The State agreed to stipulate that Floyd was shackled during the polling proceeding but would not stipulate that the jury had seen that Floyd was in shackles. The court overruled Floyd's motion for a mistrial after noting that there was no evidence whether or not the jury saw that Floyd was in shackles.

The jury continued deliberations on the afternoon of May 24, 2005, and the next morning. On the morning of May 25, the jury returned to the courtroom and announced that it had reached a unanimous verdict of guilty on all three counts. The jury was polled, and all jurors, including J.K., stated that the verdict of guilty on each of the three counts was his or her verdict. The court accepted the verdicts and judged Floyd guilty on all three counts.

On June 3, 2005, Floyd filed a motion for a new trial. A hearing on the motion was held August 5. At the hearing, Floyd made three arguments in support of a new trial. As his first and second arguments, Floyd raised the issues previously asserted relating to his appearing in shackles before the jury on the afternoon of May 24 and the issue of the prosecutor's statements of opinion during closing arguments. After considering these issues, the court stated that its rulings on the issues had not changed, and the court denied a new trial on the basis of each issue.

The third basis that Floyd asserted in support of a new trial was an allegation of improper communication between the bailiff and the jurors. At the conclusion of the August 5, 2005, hearing, the trial judge determined that the case should be temporarily assigned to a different judge to consider Floyd's motion for a new trial on the basis of the bailiff's communication. After reassignment, a hearing was held and Floyd presented evidence from J.K. and another juror regarding the bailiff's communication. J.K. was the juror who, when first polled, had stated that the verdicts of guilty on the murder and manslaughter counts were not her verdicts. J.K. testified that the communication with the bailiff occurred on May 24, after the jurors had been polled and the court had ordered the jury to resume deliberations. J.K. testified that as the jury was leaving the jury room at the end of the day, she asked the bailiff how long the jury would be required to continue deliberations. J.K. testified that the bailiff responded that the judge would " 'keep sending the jury back until you reach a unanimous decision' " and that deliberations " 'could last the rest of the week.' " J.K. stated in an affidavit, which the court admitted over the State's objection, that the bailiff's comment was "the primary factor which motivated changing [her] vote from 'not guilty' to 'guilty.' " Another juror stated in an affidavit that she was present during the exchange between J.K. and the bailiff and that the content of the exchange was as J.K. had testified.

The bailiff also testified at the hearing on the motion for a new trial. She testified that she recalled an exchange between herself and "three or four jurors" at the end of the day on May 24, 2005. However, the bailiff testified that after a juror asked whether there was a time limit to deliberations, her response was " 'there's no time limit.' " The bailiff then testified that another juror asked whether the jury could be required to deliberate until Friday and that she replied, " 'You could be.' "

Following the hearing, the court overruled Floyd's motion for a new trial. The court stated in its order that without determining whether the bailiff's recall of the conversation was more accurate than that of the jurors, the court would base its findings on the version related by the jurors because such evidence was more favorable to Floyd. The court concluded that the bailiff's

statements were not improper and that even if they were, the communication was not prejudicial to Floyd.

The case was reassigned to the original judge, and Floyd was sentenced on October 13, 2005. Floyd appeals.

## III. ASSIGNMENTS OF ERROR

Floyd asserts that the district court erred in (1) overruling his objections to the State's peremptory challenges which he asserted were improperly based on race, (2) overruling his objections and admitting evidence of prior incidents between himself and Vickers in violation of Neb. Rev. Stat. § 27-403 (Reissue 1995) and § 27-404, (3) allowing the State to present evidence contained in the protection order over Floyd's hearsay objection, (4) overruling his motion for a mistrial on the basis of improper statements in closing arguments, (5) overruling his motion for a mistrial on the basis that he was presented to the jury in shackles, and (6) overruling his motion for a new trial on the basis of improper communications between the bailiff and jurors.

## IV. STANDARDS OF REVIEW

 In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Lykens*, 271 Neb. 240, 710 N.W.2d 844 (2006). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

 A trial court's determination of whether a party has established purposeful discrimination in jury selection is a finding of fact and is entitled to appropriate deference from an appellate court because such a finding will largely turn on evaluation of credibility. *State v. Robinson, ante* p. 582, 724 N.W.2d 35 (2006). A trial court's determination that there was no purposeful discrimination in a party's use of his or her peremptory challenges and a trial court's determination of the adequacy of a party's neutral explanation of its peremptory challenges are factual determinations that will not be reversed on appeal unless clearly erroneous. *Id.*

■ The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006).

## V. ANALYSIS

As an initial matter, we note that the State argues that certain of Floyd's assignments of error do not implicate his conviction for being a felon in possession of a firearm and that even if such asserted errors require reversal of the murder or manslaughter convictions, they do not necessarily require reversal of the firearm conviction. We have previously had occasion to reverse certain convictions while affirming a felon in possession of a firearm conviction. See *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999). We conclude that one of Floyd's asserted errors requires reversal of the murder and manslaughter convictions but that no assignment of error requires reversal of the firearm conviction. Therefore, in the first section of our analysis, we consider Floyd's assignments of error as they relate to the murder and manslaughter charges, and in the second section of our analysis, we consider Floyd's assignments of error as they relate to the firearm conviction.

### 1. MURDER AND MANSLAUGHTER

#### (a) Communication Between Bailiff and Jury

Floyd asserts that the district court erred when it overruled his motion for a new trial on the basis of improper communications between the bailiff and jurors. A bailiff's failure to perform his or her duty can result in a reversal of a conviction. See *State v. Myers*, 258 Neb. 272, 603 N.W.2d 390 (1999). The State argues that because the court did not make a finding whether the bailiff's version of the communication was accurate or whether the jurors' version of the communication was accurate, the record is not sufficient for this court to review the issue. We conclude that either version was an improper communication and that the district court abused its discretion when it denied Floyd's motion for a new trial on the murder and manslaughter charges based on the improper bailiff communication.

A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. *State v. Harrison*, 264 Neb. 727, 651 N.W.2d 571 (2002). In a criminal case, misconduct involving an improper communication between a nonjuror and a juror gives rise to a rebuttable presumption of prejudice which the State has the burden to overcome. *Id.* The question of whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing reasonable inferences as to the effect of the extraneous information on an average juror. *Id.*

Improper communication between a nonjuror and a juror may involve communication between the bailiff and a juror if such communication goes outside certain limits. Such limits are set forth in Neb. Rev. Stat. § 29-2022 (Reissue 1995), which provides in relevant part:

> When a case is finally submitted to the jury, they must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict or are discharged by the court. The officer having them in charge shall not suffer any communication to be made to them, *or make any himself*, except to ask them whether they have agreed upon a verdict, unless by order of the court; nor shall he communicate to anyone, before the verdict is delivered, any matter in relation to the state of their deliberations.

(Emphasis supplied.) We further note that Neb. Rev. Stat. § 25-1116 (Reissue 1995) provides that if, after the jury has begun deliberations, the jury desires "to be informed as to any part of the law arising in the case," then the jury "may request the officer to conduct them to the court where the information upon the point of law shall be given."

Although § 29-2022 states that the bailiff, as the officer having the jury in his or her charge, shall not make "any communication" to jurors except to ask whether they have agreed upon a verdict, we recognize that some incidental communication between the bailiff and jurors beyond that specified under § 29-2022 will unavoidably occur. When such communication is limited to simple, practical matters of logistics such as the

location of the facilities used for deliberations, such communication is not likely to be prejudicial to the defendant or deny the defendant a fair trial. We note in this regard:

> Many of a bailiff's legitimate functions involve perfunctory communication with the jury, from taking their meal orders to telling them where the restroom is located. Thus, it is too broad a statement to say that all communications from a bailiff to a jury are forbidden. . . . The law forbids only communications that could possibly influence deliberations. . . . Communications necessary for the proper care of the jury, such as lunch orders and other administrative matters, do not raise an inference of impropriety because communications are neutral and innocuous.

*State v. Yonker*, 133 Wash. App. 627, 636, 137 P.3d 888, 892 (2006).

While communications concerning administrative matters may not be prejudicial, when communications involve matters of law, the risk of prejudice is present and communication by the bailiff to jurors on such matters is improper. See *Alexander v. State*, 919 S.W.2d 756, 766 (Tex. App. 1996) ("[t]here is no error when the bailiff communicates to the jury on logistical matters not dealing with the case on trial; however, there are numerous . . . cases providing that a bailiff's communications with the jury about the case on trial constitutes error"). See, also, *State v. Merricks*, 831 So. 2d 156, 160 (Fla. 2002) ("the potential for prejudice is the same, if not greater, when a bailiff, rather than a trial judge, answers a jury's inquiry directly without notice to and outside the presence of defense counsel and the State"). When jurors have questions regarding the case on trial, including questions regarding the potential duration of deliberations, the bailiff should refer such questions to the court pursuant to § 25-1116.

With respect to the communication between the bailiff and jurors in this case, the State asserts that this court cannot review the trial court's decision on the matter because the court did not make a specific finding as to which version of the communication was accurate. We note that although the bailiff and the jurors gave descriptions that differed in certain respects, each person agreed that some question and answer regarding the potential

duration of deliberations occurred. All agreed that the bailiff told jurors that the deliberation could continue "the rest of the week" or "until Friday." The main difference in the testimonies is that juror J.K. testified that the bailiff said that the judge would "keep sending the jury back until you reach a unanimous decision," while the bailiff testified that she said "there's no time limit" to the deliberations.

We conclude that either version of the communication between the bailiff and jurors in this case was an improper communication. Because either version was improper, it is not necessary to remand the cause to the district court for a finding as to which version was accurate. Whether the bailiff in this case told jurors that they would be required to deliberate until they reached a unanimous verdict or whether she told them that there was no time limit to deliberations, either statement, combined with her statement that the jurors could be required to deliberate the rest of the week, was an improper communication. The communication went beyond simple administrative matters. The jurors' questions regarding continued deliberations should have been referred to the court, and the bailiff should not have attempted to give any direct answer to the question. The proper response on the part of the bailiff would have been to refer the question to the court. We therefore determine that the district court erred in concluding that there was no improper communication between the bailiff and jurors and in failing to find that jury misconduct had occurred.

Having determined that jury misconduct occurred, we further conclude that such misconduct was sufficiently prejudicial that Floyd was denied a fair trial. The question whether prejudice resulted from jury misconduct must be resolved by drawing reasonable inferences as to the effect of the occurrence on an average juror. See *State v. Harrison*, 264 Neb. 727, 651 N.W.2d 571 (2002). Although J.K. stated in her affidavit, admitted over the State's objection, that the communication from the bailiff affected her verdict, the question of prejudice in this case must be based on a determination of the effect on an average juror rather than the actual effect on J.K. In this regard, we note that Neb. Rev. Stat. § 27-606(2) (Reissue 1995) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

Disregarding statements made by J.K. in her affidavit regarding the effect of the communication, we conclude that the improper communication from the bailiff to the juror would have affected the average juror in a way that would have prejudiced Floyd and denied him a fair trial. In reaching this conclusion, we consider the circumstances surrounding the communication. At the time the communication was made, the jury had been ordered to return to deliberations after it was determined that the jury's verdicts on the murder and manslaughter charges were not unanimous. The communication was made to the juror who was known to be the lone dissenting juror. Either directly or indirectly, the communication focused on the potential effect that the juror's continued dissent would have on the length of deliberations. We determine that the communication could have pressured the average juror to change his or her vote in order to avoid protracted deliberations.

Because the communication occurred when the jury was not yet unanimous on the charges of first degree murder and manslaughter of an unborn child, we conclude that the improper communication was prejudicial to Floyd and denied him a fair trial on those charges. We note, however, that the jury was polled prior to the improper communication and that the jury was already unanimous as to Floyd's guilt on the charge of being a felon in possession of a firearm. We therefore conclude that the improper communication which occurred after the

unanimous verdict on the firearm charge had been announced was not prejudicial as to the firearm conviction. Because the improper communication denied Floyd a fair trial on the murder and manslaughter charges, we determine that the district court abused its discretion by failing to grant Floyd a new trial on these convictions. It is therefore necessary to reverse Floyd's convictions on the charges of first degree murder and manslaughter of an unborn child.

 Upon finding error in a criminal trial, the reviewing court must determine whether the evidence offered by the State and admitted by the trial court, whether erroneously or not, would have been sufficient to sustain the conviction before the cause is remanded for a new trial. *State v. Beeder*, 270 Neb. 799, 707 N.W.2d 790 (2006). Although the Double Jeopardy Clauses of the federal and state Constitutions do not protect against a second prosecution for the same offense where a conviction is reversed for trial error, they bar retrial if the reversal is necessitated because the evidence was legally insufficient to sustain the conviction. *Id.* Because the evidence admitted was sufficient to sustain convictions on the charges, we conclude that Floyd can be retried on the murder and manslaughter charges without violating double jeopardy. We therefore reverse the murder and manslaughter convictions and remand the cause for a new trial on first degree murder and manslaughter of an unborn child.

### (b) Other Issues Not Likely to Recur on Remand

An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. *Perry Lumber Co. v. Durable Servs.*, 271 Neb. 303, 710 N.W.2d 854 (2006). However, with regard to Floyd's remaining assignments of error, we do not find that such issues will inevitably recur on remand in a new trial for murder and manslaughter. The State's use of peremptory challenges, the prosecutor's repeated statements of personal opinion during closing arguments, and the appearance of Floyd in shackles during the polling proceeding were occurrences during the present trial that will not likely recur on remand, and we therefore determine that such issues

do not require discussion with regard to the retrial of the murder and manslaughter charges. We note that some of these assignments of error are discussed below as they relate to the firearm conviction.

With regard to the admission of evidence of prior incidents between Floyd and Vickers, we cannot say that the State will attempt to offer such historical evidence in a new trial. Further, we note that in its order finding evidence of certain prior incidents admissible under § 27-404, the district court, in a sweeping ruling, found that the evidence was admissible for the purposes of establishing motive, intent, plan, and absence of mistake or accident—a ruling which fails to follow our directives with respect to specificity and hinders appellate analysis. See *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999). We therefore do not find it necessary to address Floyd's assignments of error with regard to the evidence of prior incidents between Floyd and Vickers.

### 2. FELON IN POSSESSION OF A FIREARM

As noted above, the improper communication between the bailiff and jurors was not prejudicial with regard to the felon in possession of a firearm charge and does not require reversal of that conviction on that basis. We therefore consider Floyd's remaining assignments of error to the extent they relate to the firearm conviction.

We note first that with respect to Floyd's assignment of error regarding his appearance before the jury in shackles, the proceeding at which Floyd was in shackles was the proceeding at which the jury was polled as to its verdicts. Although the jury was not unanimous with regard to the murder and manslaughter charges, the jury had already declared its unanimous verdict and found Floyd guilty with regard to the firearm charge. Because the jury had already unanimously determined Floyd to be guilty on the firearm charge, his appearance in shackles subsequent thereto was not prejudicial. We therefore reject the assignment of error regarding Floyd's appearance in shackles as it pertains to the firearm conviction. With respect to the assignments of error regarding admission of evidence of prior incidents between Floyd and Vickers and admission of the protection order,

we note that such evidence pertained to the murder and manslaughter charges and not to the firearm charge. We therefore reject these assignments of error as not relevant to the firearm charge. Floyd's two remaining assignments of error, regarding the State's use of peremptory challenges and the prosecutor's statements in closing arguments, are considered below as they pertain to the felon in possession of a firearm charge.

### (a) *Batson* Challenge

Floyd asserts that the district court erred in rejecting his *Batson* challenge to the State's use of peremptory challenges to strike two potential jurors who were African-American. We conclude that the court's determinations with regard to the *Batson* challenge were not clearly erroneous, and we reject Floyd's assignment of error.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the U.S. Supreme Court held that the Equal Protection Clause of the 14th Amendment forbids prosecutors from using peremptory challenges to strike potential jurors solely on account of their race. *State v. Robinson, ante* p. 582, 724 N.W.2d 35 (2006). The evaluation of whether a party has used peremptory challenges in a racially discriminatory manner is a three-step process. *Id*. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. A defendant satisfies the requirements of this step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the trial court must then determine whether the defendant has carried his or her burden of proving purposeful discrimination. The final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding

racial motivation rests with, and never shifts from, the opponent of the strike. *Id.*

In the present case, two African-Americans were stricken from the jury and one African-American served as a juror. The court in this case determined that Floyd had made a prima facie showing that strikes had been used on the basis of race. But after the State offered explanations that the court determined to be race neutral, the court concluded that Floyd had not carried his burden of proving purposeful racial discrimination, and the court denied Floyd's *Batson* challenge. A trial court's determination that there was no purposeful discrimination in the party's use of his or her peremptory challenges and a trial court's determination of the adequacy of a party's neutral explanation of its peremptory challenges are factual determinations that will not be reversed on appeal unless clearly erroneous. *State v. Robinson, supra.* We do not find the district court's findings in this case to be clearly erroneous. The explanations offered by the State were that one prospective juror may have known friends of one of the victims and may have heard them talking about the case and that the other juror may have had religious convictions that would have prevented him from judging another person and accepting the court's direction to apply the law. Whether or not these explanations were persuasive, they were race neutral, and the district court was not clearly erroneous in so finding.

After the State gave its explanations, Floyd did not submit additional evidence and relied on his prima facie showing that the two jurors were African-American. In light of the State's race-neutral explanations, Floyd needed to present evidence of purposeful discrimination. It is fundamental that a party claiming discrimination in the use of peremptory challenges make a record which supports an inference of discriminatory purpose. *Jacox v. Pegler,* 266 Neb. 410, 665 N.W.2d 607 (2003). Facts must be included in the record by sworn testimony, exhibits, stipulations, admissions, or judicial notice. *Id.* The stipulation in the record that the two stricken jurors were African-American was not sufficient to meet Floyd's burden to prove purposeful discrimination. We conclude that the district court was not clearly erroneous in determining that Floyd did not

prove purposeful discrimination, and we therefore reject Floyd's assertion that the court erred in denying his *Batson* challenge.

(b) Closing Arguments

Floyd asserts that the district court erred in overruling his motion for a mistrial on the basis of the prosecutor's statements in closing arguments regarding the State's opinions as to Floyd's guilt. We conclude that because the court instructed the jury to disregard the statements and because the statements essentially pertained to the murder and manslaughter charges, the court did not err in overruling the motion for a mistrial with respect to the felon in possession of a firearm charge.

We have stated that it is improper for a prosecutor in oral argument to attempt to persuade the jury by giving an expression of his or her personal opinion of the guilt of the accused other than as a deduction from the evidence. *State v. Leonard*, 196 Neb. 731, 246 N.W.2d 68 (1976); *State v. Brooks*, 189 Neb. 592, 204 N.W.2d 86 (1973). However, before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred. *State v. Beeder*, 270 Neb. 799, 707 N.W.2d 790 (2006). Whether a prosecutor's inflammatory remarks are sufficiently prejudicial to constitute error must be determined upon the facts of each particular case. *Id.* A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006).

We note that each time Floyd objected to one of the prosecutor's statements in this case, the court instructed the jury to disregard the prosecutor's statement of personal opinion. We further note that the prosecutor's statements focused on the State's opinion regarding Floyd's guilt as to the murder and manslaughter charges. Because we have reversed Floyd's convictions on the murder and manslaughter charges on another basis, we consider the effect of the prosecutor's statements only as to whether such statements were sufficiently prejudicial as to prevent a fair trial on the firearm charge.

In the instant case, there was uncontroverted testimony that when Floyd was at his former girl friend's house on the night of the shooting, he had a semiautomatic gun in his possession. There was also evidence that Floyd had been convicted of a felony in 1997.

The felon in possession statute, Neb. Rev. Stat. § 28-1206(1) (Reissue 1995), provides: "Any person who possesses any firearm or brass or iron knuckles and who has previously been convicted of a felony or who is a fugitive from justice commits the offense of possession of a deadly weapon by a felon or a fugitive from justice." There was evidence as to each element at the trial of this case.

Because the prosecutor's statements of personal opinion essentially related to the murder and manslaughter charges and because the court promptly and clearly instructed the jury to disregard the statements, and the evidence of felon in possession was overwhelming and without contradiction, we determine that the prosecutor's statements did not prevent a fair trial on the firearm charge. We therefore conclude in connection with the prosecutor's statements during closing that the court did not abuse its discretion by denying Floyd's motion for a mistrial on the felon in possession of a firearm charge.

## VI. CONCLUSION

We reject Floyd's assignments of error with respect to the conviction of being a felon in possession of a firearm, and we affirm Floyd's sentence of 20 to 20 years' imprisonment on that conviction. We conclude, however, that with regard to the convictions for first degree murder and manslaughter of an unborn child, the district court abused its discretion by failing to grant Floyd's motion for a new trial on the basis of the improper communication between the bailiff and jurors. We therefore reverse Floyd's convictions for first degree murder and manslaughter of an unborn child and remand the cause for a new trial on those charges.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.