783 N.W.2d 749 (2010)
280 Neb. 11
STATE of Nebraska, appellee,
v.
Terrell T. THORPE, appellant.
No. S-09-442.
Supreme Court of Nebraska.
June 18, 2010.
*754 Andrew J. Wilson, of Walentine, O'Toole, McQuillan & Gordon, Omaha, for appellant.
Jon Bruning, Attorney General, and George R. Love for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

I. SUMMARY
After a jury trial, the State convicted Terrell T. Thorpe of two counts of first degree murder and two counts of use of a weapon to commit a felony. The court sentenced him to life imprisonment without parole on each of the murder counts and to 30 to 40 years' imprisonment and 40 to 50 years' imprisonment on the use of a weapon counts. He appeals his convictions and sentences. We affirm his convictions on the murder charges and the convictions and sentences on the weapons charges. But we conclude that the life without parole sentences are invalid. We vacate the life without parole sentences and remand to the district court to sentence Thorpe to life sentences.

II. ASSIGNMENTS OF ERROR
Thorpe assigns three errors: (1) The court erred in failing to find that the State's use of a peremptory challenge to exclude juror No. 31 violated his right to equal protection; (2) the court erred in overruling his motion for mistrial based on the improper contact between a witness and a juror; and (3) the court erred in giving instruction No. 14 regarding conscious guilt.

III. BACKGROUND
The underlying facts are substantially similar to those addressed by this court in State v. Sellers,[1] which addressed an accomplice's appeal. Summarized, the facts are that on two separate occasions, Taiana Matheny lured a young male to a remote *755 location, and then Terry Sellers and Thorpe beat, robbed, and murdered him. Thorpe's appeal focuses on three events that occurred during his trial, and so we will set out additional facts to separately address these issues.

IV. ANALYSIS

1. BATSON CHALLENGE DURING JURY SELECTION
Thorpe argues that the State exercised a peremptory challenge to remove juror No. 31 solely because of her race. The Equal Protection Clause of the 14th Amendment forbids prosecutors from using peremptory challenges for this reason.[2]

(a) Additional Facts
During voir dire, the prosecutor asked, "[I]f the State proves beyond a reasonable doubt that . . . Thorpe is guilty of these charges, is there anyone here that would not be able to vote guilty?" Juror No. 31 answered:
Just with the evidence that they're saying, I still would have a problem. `Cause how do I know it's real, you know? . . . And if he's saying he didn't do it, how do I even know he's telling the truth? But I wouldn't just say, oh, yeah, he did it, you know.
The prosecutor then explained that the jurors were to decide whether, based upon what they saw and heard in the courtroom, the State had proved guilt beyond a reasonable doubt. Juror No. 31 responded:
Because I have a problem with that, with the reasonable doubt. If you're not sure yourselves, how would you be able to say, yeah, you did it? I mean, that's mymy thinking.
The reasonable doubt, um, well, it says at this time you blah, blah, blah or this time blah, blah, blah. But we didn't see at that time, but we're saying all evidence shows it, and that's what I have a problem with.
When the prosecutor explained that a "beyond a reasonable doubt" standard was the standard applied in every criminal case in America, juror No. 31 interrupted:
Well, I have the same feelingsyou know, I have the same feelings with all of it. If I didn't see youlike I'm at home with my children and I don't see it. This one is saying that and this one is sayingthe older people are like, whoop `em all and you get the right one.
Well, now they're all bigger and so I can't do it like that. Sometimes I let it go because we're bickering and arguing and I don't know who did it. But that happens in my life a lot. So like I said, I couldn't just say, okay, what so-and-so is saying, I'll go with that.
When the prosecutor responded that "[i]t sounds to me like what you're saying is that you put that burden of proof pretty high," juror No. 31 answered, "Yes, I do."
Ultimately, the State exercised one of its peremptory strikes on juror No. 31. Thorpe objected, arguing that the strike violated the principles of Batson v. Kentucky.[3] In response, the prosecutor noted that of the 38 total jurors struck by the State and the defense, 4 were African-American. The prosecutor further noted that of those four, two were stricken by the defense, one by the court, and only one, juror No. 31, by the State. When asked by the court why it struck juror No. 31, the prosecutor responded:

*756 The same reason the State struck . . . Juror No. 23. Both [juror No. 31] and [juror No. 23], in describing their interpretation of beyond a reasonable doubt, they both said that they gave it a very high standard, higher than I believe what the law requires.
[Juror No. 31], in fact, I believe said that she would have a difficult time finding someone guilty if she didn't actually see them do it herself. That would be the State's reason . . . .
The prosecutor then clarified that the specific statement made by juror No. 31 that concerned him was, "How would I know he did it if I didn't see him do it." The prosecutor also noted that he was concerned because juror No. 31 had stated that the prosecutors "don't even know whether he did it, and now we have to decide." The prosecutor explained that another reason for the strike was that juror No. 31's comments left the "impression that she didn't believe the State believed . . . Thorpe was guilty." The court overruled the Batson challenge.

(b) Standard of Review
The evaluation of whether a party has used peremptory challenges in a racially discriminatory manner is a three-step process.[4] First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor has exercised peremptory challenges because of race.[5] Second, if the defendant makes the requisite showing, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.[6] Third, the trial court then determines whether the defendant has carried his or her burden of proving purposeful discrimination.[7] The third step requires the court to evaluate the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.[8]
In several cases, we have stated that the adequacy of a party's neutral explanation of its peremptory challenges is a factual determination.[9] But this standard has confused the facial validity of an attorney's proffered explanation with its persuasiveness. In Hernandez v. New York,[10] the U.S. Supreme Court's plurality opinion stated that "[i]n evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." And it further stated, "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."[11]
But the facial validity of an attorney's explanation is different from its persuasiveness. Persuasiveness is relevant to the final step in the analysiswhether the *757 defendant has satisfied his or her burden of proving purposeful discrimination. It is the final step in the analysis, in which the court must decide whether an attorney's explanation is persuasive, that presents a question of fact. In other words, whether an attorney's race-neutral explanation for a peremptory challenge should be believed presents a question of fact.[12]
So we now correct our standard of review to be more consistent with the U.S. Supreme Court's precedent. For Batson challenges, we will review de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. And we will review for clear error a trial court's factual determinations whether an attorney's race-neutral explanation is persuasive and whether his or her use of a peremptory challenge was purposefully discriminatory.

(c) Resolution
The trial court, without specifically finding that Thorpe had made a prima facie case, asked the State to tender a race-neutral explanation for the strike, and the State complied. Then under the third step, the trial court evaluated the persuasiveness of that explanation in determining whether Thorpe carried his burden of proving a racial motivation for the strike. Under this circumstance, whether Thorpe made a prima facie showing of purposeful discrimination is moot.[13] We consider only whether the prosecutor offered an adequate race-neutral explanation for the strike and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous.[14]
Although the prosecutor must present a comprehensible reason, the second step of the analysis does not demand an explanation that is persuasive, or even plausible; it is sufficient if the reason is not inherently discriminatory.[15] As examples, we have determined the State's explanations for a strike to be race neutral in the following circumstances: (1) when a prospective juror's residence was close to the crime scene,[16] (2) when a prospective juror had a close family member who was a convicted felon,[17] (3) when a prospective juror was employed at a church,[18] and (4) when a prospective juror was young and single and might be attracted to the defendant.[19] In contrast, when reviewing a gender discrimination challenge, we held that the State's use of peremptory strikes on six males was not supported by a gender-neutral reason when the State explained that its purpose was to achieve gender balance on the jury.[20]
These cases illustrate that only inherently discriminatory explanations are facially invalid. We conclude that the State's articulated reasons for striking juror No. 31 were clearly race neutral because they had no relationship to her race.
But Thorpe argues that even if the articulated reasons were race neutral, the trial court nevertheless erred in its evaluation of the persuasiveness of the reasons *758 offered by the State. Specifically, he argues that the State's reasons for striking juror No. 31 are unpersuasive because they were based on "nothing more than misinterpretation of comments" made by that juror.[21] We disagree.
A review of the record quickly shows that the State's articulated reasons for striking juror No. 31 were persuasive. Any prosecutor who could fog a mirror would have been concerned about juror No. 31's confusing beliefs about the proof necessary to satisfy the "beyond a reasonable doubt" standard. She was in effect saying that neither she nor the prosecutor could know that Thorpe committed the crimes charged because neither of them had witnessed the act.
Also, nothing in the record shows that the explanation was pretextual. In determining whether a defendant has established purposeful discrimination in the use of a peremptory challenge, a trial court may consider whether the prosecutor's criterion has a disproportionate impact on a particular race. If so, the court may consider whether such evidence shows the prosecutor's proffered explanation was pretextual.[22]
In determining whether there is a sufficient pattern of peremptory strikes to support an inference of discrimination, we have recognized the following factors as relevant: (1) whether members of the relevant racial or ethnic group served unchallenged on the jury and whether the striking party struck as many of the relevant racial or ethnic group from the venire as it could; (2) whether there is a substantial disparity between the percentage of a particular race or ethnicity struck and the percentage of its representation in the venire; and (3) whether there is a substantial disparity between the percentage of a particular race or ethnicity struck and the percentage of its representation on the jury.[23] Although we lack information in the record to examine all of those factors, the record does show that of the 38 jurors struck by the parties, 4 were African-American. It also shows that of those four jurors, two jurors were struck by Thorpe, one juror was struck by the court, and only one juror was struck by the State. The State's use of a peremptory strike on only one of four African-American jurors who were struck further supported an inference that the State's use of its peremptory challenge on juror No. 31 was not purposeful discrimination.
We conclude that the trial court did not clearly err in determining that Thorpe failed to carry his burden of proving purposeful discrimination.

2. JUROR MISCONDUCT
Thorpe asserts that the trial court erred when it overruled his motion for mistrial based on improper communications between a witness, Omaha Police Lt. Michele Bang, and a juror.

(a) Additional Facts
In its case in chief, the State called Bang, who oversaw the general investigation. She testified about the cellular telephone calls that were made and received between Sellers, Matheny, and Thorpe at or around the time of the crimes.
Bang's direct testimony was interrupted by a break for lunch. As Bang left for the break, a juror stepped on the elevator with her. The juror asked if she was a relative of "Shelly" Bang, and Bang informed him that that was her nickname and that she was Shelly Bang. The juror then told Bang that one of his daughters went to school *759 with her, and Bang remembered that his daughter's name was Diane and that they had gone to high school together. Bang stated that the juror "smiled because I remembered his daughter was Diane," but that the conversation ended after that and they both got off the elevator. The juror testified that the conversation occurred in substantially the same way. When the court asked whether his conversation with Bang would affect him in any way or prevent him from being a fair and impartial juror, the juror responded, "No. What difference would it make?"
After the in-chambers testimony from Bang and the juror, Thorpe moved for a mistrial. The court overruled the motion, finding that the communication was a "very innocent conversation" and that it did not affect the juror's ability to be fair and impartial.

(b) Standard of Review
We will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.[24] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[25]

(c) Resolution
A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.[26] In a criminal case, misconduct involving an improper communication between a nonjuror and a juror gives rise to a rebuttable presumption of prejudice which the State has the burden to overcome.[27] Extraneous material or information considered by a jury can be prejudicial without proof of actual prejudice if (1) the material or information relates to an issue submitted to the jury and (2) there is a reasonable possibility that it affected the jury's verdict to the challenger's prejudice.[28] Whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing reasonable inferences as to the effect of the extraneous information on an average juror.[29]
We have not applied a consistent standard for reviewing a trial court's determination of the effect extraneous information would have on an average juror. In recent direct appeals and postconviction appeals, we have clearly reviewed this determination de novo.[30] But in at least one postconviction decision, we explicitly stated that we were reviewing the district court's determination on this issue under a "clearly erroneous" standard.[31] That is the general standard for reviewing a postconviction court's factual findings. But a review of that case shows that we independently determined that under all the circumstances, there was not a reasonable possibility that communications between a nonjuror and jurors would have affected the jury's verdict. Because of that determination, we concluded that the district *760 court was not clearly erroneous in determining that the juror misconduct did not prejudice the defendant.[32]
These cases illustrate that we have not reviewed determinations of prejudice from juror misconduct only for clear error. So we agree with courts that have held that whether a defendant was prejudiced by juror misconduct presents a mixed question of law and fact because it involves legal conclusions about a defendant's right to an impartial jury.[33] We conclude that when a defendant moves for a mistrial based on juror misconduct, we will review the trial court's determinations of witness credibility and historical fact for clear error; we review de novo the trial court's ultimate determination whether the defendant was prejudiced by juror misconduct.
The record before us clearly shows that an improper communication occurred between a juror and the witness Bang. Because the misconduct involved a juror and a nonjuror, it gives rise to a rebuttable presumption of prejudice to Thorpe which the State has the burden to overcome.[34]
Here, the communication was made during the State's case in chief when evidence was still being presented. But the communication was unrelated to any issue before the jury. The communication was to one juror only, and that juror did not share that communication with the remaining members of the jury. And when asked whether the communication would affect his ability to remain impartial, the juror stated, "No. What difference would it make?"
Under our de novo review, we conclude that the dialog between Bang and the juror on the elevator amounted to mere exchanges of pleasantries. Because the dialog was not related in any way to the issues at trial, we conclude that it would not have affected the average juror's ability to remain impartial. The trial court correctly denied Thorpe's motion for mistrial.

3. JURY INSTRUCTION ON CONSCIOUS GUILT
Thorpe contends that the trial court erred in giving instruction No. 14. The trial court gave this instruction in response to the State's evidence that Thorpe had attempted to intimidate a witness.

(a) Additional Facts
Following a plea agreement, Matheny testified for the State. During her direct examination, she stated that in August 2008, she was being transferred to a holding cell in the county jail when she encountered Thorpe. The two made eye contact, and Thorpe said, "Don't come to court." Another female inmate overhead the conversation and confirmed that Thorpe told Matheny "not to testify." This inmate testified that she could tell Matheny and Thorpe knew each other from how their demeanors changed when they saw each other. The inmate thought that Thorpe looked "threatening" when he saw Matheny and that Matheny looked scared when she saw Thorpe. The inmate testified that after Thorpe made the statement, Matheny got very quiet and "looked pretty upset. Maybe scared."
During the State's case in chief, Thorpe moved to strike the testimony, arguing that it was not sufficient to show that *761 Thorpe threatened or intimidated Matheny. The court deferred ruling on the motion to strike until the jury instruction conference.
At that conference, the court proposed jury instruction No. 14 regarding conscious guilt. It provided:
You have heard evidence regarding the Defendant's alleged attempt to prevent a State's witness from testifying in this case. A Defendant's attempted intimidation or intimidation of a State's witness may be evidence of the Defendant's "conscious guilt" that a crime has been committed and serves as a basis for an inference that the Defendant is guilty of the crimes charged. Such evidence may be considered by you in determining whether the State has proved the elements of each of the crimes charged beyond a reasonable doubt.
Thorpe objected to the instruction, arguing that it should not be included because the evidence failed to show an inference of guilt. He then renewed his motion to strike the testimony of Matheny and the female inmate. The court overruled Thorpe's request. Thorpe then noted that he did not have any additions or corrections to the instruction as it was proposed.

(b) Standard of Review
Whether a jury instruction is correct is a question of law.[35] When reviewing questions of law, we resolve the questions independently of the lower court's conclusions.[36]

(c) Resolution
Evidence of a defendant's attempted intimidation or intimidation of a State's witness is relevant evidence of the defendant's "conscious guilt" that a crime has been committed. Also, it can serve as a basis for an inference that the defendant is guilty of the crime charged.[37] Thorpe does not quibble with this general proposition, but instead contends that the testimony does not sufficiently establish that he either attempted to intimidate or intimidated Matheny. So, he argues that the testimony fails to support an inference of his conscious guilt.
We addressed a similar argument in State v. Freeman.[38] The State convicted William Freeman of sexually assaulting a college student after a party. A male witness who danced with the victim at the party testified that about 1 year after the party, he and Freeman talked at an Omaha bar. During the conversation, Freeman indicated that the police had contacted him about the assault. Freeman then asked the witness if he had kissed the victim on the night of the party. When the witness stated that he had not, Freeman then said either "`"Well, it would help me out if you did"'" or "`"It would have helped me out if you did."'"[39] We held that the State could not admit this evidence to demonstrate that Freeman attempted to intimidate the witness, because it was unclear what Freeman actually said and Freeman took no other steps to try to influence the witness' testimony.
But unlike the testimony in Freeman, here the record is clear as to the words used by Thorpe, and equally clear that those words were an attempt by him to discourage Matheny from testifying against him at his trial. Also, the testimony *762 indicates both that Thorpe looked "threatening" when he spoke to Matheny and that she looked upset or scared after he spoke to her. Contrary to Thorpe's argument, this evidence sufficiently supports an inference that Thorpe was conscious of his guilt and sought to intimidate Matheny so that she would not testify against him. The district court did not err in giving instruction No. 14.

4. LIFE WITHOUT PAROLE
Although Thorpe does not assign or argue the issue, there is plain error regarding his two sentences of life without parole for the murders. Plain error will be noted only where an error is evident from the record, prejudicially affects a substantial right of a litigant, and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[40]
The Legislature has set forth the penalties for various felony classes in Neb.Rev. Stat. § 28-105 (Reissue 2008). Before a 2002 amendment, the penalty for first degree murder, a Class IA felony, was "[l]ife imprisonment."[41] The 2002 amendment changed that penalty to "[l]ife imprisonment without parole."[42] But we held in State v. Conover[43] that the 2002 amendment was unconstitutional because it exceeded the scope of the proclamation that called the Legislature into special session. We held in Conover that a sentence of life imprisonment without parole was not statutorily mandated, and because it was erroneous but not void, we remanded with directions to resentence the defendant to life imprisonment on his murder convictions.
In State v. Gunther[44] the defendant argued that under our holding in Conover, his sentence of life imprisonment without parole was erroneous but not void and sought remand for imposition of a sentence of life imprisonment. The State conceded this error, and we remanded for the imposition of a sentence of life imprisonment. And in State v. Robinson,[45] a defendant was sentenced to life imprisonment without parole even though the murder he committed occurred before the 2002 amendment to § 28-105. On plain error review, we found this sentence to be erroneous but not void, and remanded for imposition of a sentence of life imprisonment.
We conclude that allowing Thorpe's sentences of "[l]ife imprisonment without parole" to stand would result in damage to the judicial process because the 2002 amendment to § 28-105 was "stricken" by this court's decision in Conover. The Legislature has taken no action to amend § 28-105 or otherwise redefine the penalty for first degree murder since our decision in Conover. Because a sentence of "life imprisonment without parole" is not a valid sentence for first degree murder in Nebraska, we remand with directions that the district court resentence Thorpe to "life imprisonment" on his murder convictions.

*763 V. CONCLUSION
Thorpe's assignments of error lack merit. But plain error exists in the sentences imposed for his murder convictions. We affirm the convictions and sentences on the weapons charges. We affirm the murder convictions but vacate the sentences on the murder charges. We remand with directions that the district court sentence Thorpe to life imprisonment on both murder charges.
AFFIRMED IN PART, AND IN PART REMANDED WITH DIRECTIONS.
NOTES
[1] State v. Sellers, 279 Neb. 220, 777 N.W.2d 779 (2010).
[2] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007).
[3] Batson, supra note 2.
[4] See, Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006); Gutierrez, supra note 2.
[5] See Gutierrez, supra note 2.
[6] See id.
[7] See id.
[8] Id.
[9] See, e.g., Gutierrez, supra note 2; State v. Floyd, 272 Neb. 898, 725 N.W.2d 817 (2007), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007); State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006); State v. Lowe, 267 Neb. 782, 677 N.W.2d 178 (2004).
[10] Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (emphasis supplied).
[11] Id., 500 U.S. at 360, 111 S.Ct. 1859.
[12] See Hernandez, supra note 10. See, also, McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005); Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).
[13] See Gutierrez, supra note 2.
[14] See Hernandez, supra note 10.
[15] See id.
[16] Robinson, supra note 9.
[17] State v. Walker, 272 Neb. 725, 724 N.W.2d 552 (2006).
[18] Id.
[19] State v. Myers, 258 Neb. 300, 603 N.W.2d 378 (1999).
[20] Lowe, supra note 9.
[21] Brief for appellant at 12.
[22] See Hernandez, supra note 10.
[23] See Gutierrez, supra note 2, citing U.S. v. Ochoa-Vasquez, 428 F.3d 1015 (11th Cir. 2005).
[24] See State v. Daly, 278 Neb. 903, 775 N.W.2d 47 (2009).
[25] Id.
[26] Floyd, supra note 9; State v. Harrison, 264 Neb. 727, 651 N.W.2d 571 (2002).
[27] Id.
[28] See Harrison, supra note 26.
[29] Id.
[30] See, e.g., Floyd, supra note 9; State v. Williams, 253 Neb. 111, 568 N.W.2d 246 (1997).
[31] See Harrison, supra note 26, 264 Neb. at 737, 651 N.W.2d at 580.
[32] See id. See, also, Williams, supra note 30.
[33] See, Vigil v. Zavaras, 298 F.3d 935 (10th Cir.2002); Loliscio v. Goord, 263 F.3d 178 (2d Cir.2001); Sassounian v. Roe, 230 F.3d 1097 (9th Cir.2000); U.S. v. Cheek, 94 F.3d 136 (4th Cir. 1996); People v. Avila, 46 Cal.4th 680, 208 P.3d 634, 94 Cal.Rptr.3d 699 (2009); People v. Wadle, 77 P.3d 764 (Colo.App.2003); Zana v. State, 216 P.3d 244 (Nev.2009).
[34] See Floyd, supra note 9.
[35] See State v. Bormann, 279 Neb. 320, 777 N.W.2d 829 (2010).
[36] See id.
[37] See State v. Clancy, 224 Neb. 492, 398 N.W.2d 710 (1987), disapproved on other grounds, State v. Culver, 233 Neb. 228, 444 N.W.2d 662 (1989).
[38] State v. Freeman, 267 Neb. 737, 677 N.W.2d 164 (2004).
[39] Id. at 744, 677 N.W.2d at 172.
[40] State v. Vela, 279 Neb. 94, 777 N.W.2d 266 (2010); State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006).
[41] See, § 28-105(1) (Reissue 1995); State v. Conover, 270 Neb. 446, 703 N.W.2d 898 (2005).
[42] See 2002 Neb. Laws, L.B. 1, 3d Spec. Sess. (Nov. 22, 2002).
[43] Conover, supra note 41.
[44] State v. Gunther, 271 Neb. 874, 716 N.W.2d 691 (2006).
[45] State v. Robinson, 271 Neb. 698, 715 N.W.2d 531 (2006).