Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/13/2020 08:07 AM CDT

State of Nebraska, appellee, v.
Erica A. Jenkins, appellant.

___ N.W.2d ___

Filed October 6, 2020.    No. A-19-430.

1. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision about whether to grant a motion for mistrial unless the court has abused its discretion.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Criminal Law: Juror Misconduct: Proof.** A criminal defendant claiming juror misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of juror misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.

4. **Criminal Law: Juror Misconduct: Appeal and Error.** An appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that the trial court observed the jurors when they testified.

5. **Trial: Evidence: Appeal and Error.** An appellate court reviews the trial court's conclusions with regard to evidentiary foundation for an abuse of discretion.

6. **Trial: Evidence: Witnesses.** There is sufficient foundation to render communications by telephone admissible in evidence where the identity of the person with whom the witness spoke or the person whom he or she heard speak is satisfactorily established. And a witness testifying positively that he or she recognized, by voice, the person with whom he or she was talking, is generally sufficient to present the evidence to the jury to determine whether the conversation actually occurred.

7. **Trial: Evidence: Appeal and Error.** The improper admission of evidence is a trial error and subject to harmless error review.

8. **Criminal Law: Juries: Evidence.** In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.

9. **Trial: Convictions: Evidence.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

10. **Jury Instructions.** Whether jury instructions given by a trial court are correct is a question of law.

11. **Judgments: Appeal and Error.** When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

12. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

13. **Criminal Law: Juries: Sentences.** Any fact that increases the mandatory minimum sentence for a crime is an "element" of the crime and not a sentencing factor. Each element of an offense must be submitted to the jury.

14. **Criminal Law: Juries: Proof.** Pursuant to the language of Neb. Rev. Stat. § 28-932(1) (Reissue 2016), the use of a deadly or dangerous weapon in the commission of assault by a confined person is an element of the offense which must be submitted to the jury and proved beyond a reasonable doubt, because the use of a weapon increases the offense of assault by a confined person from a Class IIIA felony to a Class IIA felony.

15. **Indictments and Informations: Lesser-Included Offenses: Notice: Jury Instructions.** A trial court can, in certain circumstances, sua sponte instruct the jury on a lesser-included offense without the State's specifically alleging the lesser-included offense in the information. However, the defendant has to have been afforded fair notice of the lesser-included offense.

16. **Indictments and Informations: Lesser-Included Offenses: Notice.** The nature of the crime charged in the information can provide the defendant with notice that he or she could face a lesser-included offense charge.

17. **Jury Instructions: Appeal and Error.** Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.

18. **Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

Appeal from the District Court for York County: James C. Stecker, Judge. Affirmed.

Gregory C. Damman, of Blevens & Damman, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Pirtle, Bishop, and Arterburn, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Erica A. Jenkins appeals from her conviction in the district court for York County for assault by a confined person with a deadly weapon. A jury found Jenkins guilty, and the court thereafter found her to be a habitual criminal and sentenced her to 20 to 40 years' imprisonment. On appeal, Jenkins assigns three errors. First, she asserts that the district court erred in overruling her motion for a mistrial after it was discovered that certain prospective jurors had discussed the case amongst themselves during the jury selection process. Second, she asserts that the district court erred in permitting a prison employee to testify about statements the employee overheard Jenkins say to other inmates. Third, she asserts that the district court erred in withdrawing and revising the jury instruction regarding the elements of the charge of assault by a confined person after the instruction was given to the jury. For the reasons set forth herein, we affirm Jenkins' conviction.

## II. BACKGROUND

Count I of the information filed by the State against Jenkins alleged that on September 24, 2016, Jenkins, while confined in a jail or adult correctional facility, used a deadly or

dangerous weapon to "intentionally, knowingly, or recklessly cause bodily injury to" a fellow inmate, Christine Bordeaux. Count II of the information alleged that Jenkins used a deadly weapon to commit a felony. The information further alleged Jenkins to be a habitual criminal.

The evidence presented at trial revealed that a few days prior to September 24, 2016, Jenkins was moved into a cell at the Nebraska Correctional Center for Women (NCCW), which cell was already occupied by Bordeaux and two other inmates. Jenkins and Bordeaux were related to each other and had known each other outside of the NCCW. In fact, they were codefendants in the felony cases which resulted in their incarcerations. Bordeaux had testified against Jenkins in exchange for a reduced sentence, and she was "also prepared to testify against [Jenkins] in other criminal matters she was charged with." Bordeaux indicated that "everybody" in the NCCW knew that Jenkins was upset with Bordeaux because of her testimony.

During the trial, Bordeaux testified that she did not want to be placed in the same cell as Jenkins. She relayed her concerns to prison staff and tried to stay out of the cell as much as possible because "there was a lot of tension in the air in the room." However, Bordeaux also admitted that when she arrived at the NCCW, she did not formally request to be kept away from Jenkins, because according to Bordeaux, such a request would have restricted her housing options and restricted her access to certain programming. Bordeaux told prison staff that she did not fear for her safety upon entering the NCCW, even though she was aware that Jenkins was already placed there.

There was conflicting evidence presented regarding whether Jenkins wanted to be placed in the same cell as Bordeaux. Although one prison employee testified that he remembered Jenkins "adamantly" desiring to be placed in Bordeaux's cell, other inmates who testified on Jenkins' behalf indicated that Jenkins did not want to move into Bordeaux's cell and was, in fact, upset with the assignment. Another prison employee

sent an email to a coworker the morning of September 24, 2016, indicating that Jenkins was upset with her placement in Bordeaux's cell because of the amount of property being stored there.

The State's main witnesses at trial were Bordeaux and an inmate who had assisted Jenkins in the assault, Priscilla Fields. Bordeaux testified that prior to Jenkins' being moved into her cell, she and Jenkins had interacted in the common areas of the NCCW. Two weeks prior to September 24, 2016, Jenkins had asked Bordeaux to sign an affidavit and other documents retracting the testimony Bordeaux had given against Jenkins during Jenkins' trial. Bordeaux indicated that it was her understanding that Jenkins wanted to use the affidavit to obtain a new trial. Bordeaux told Jenkins that she would be willing to sign the papers, but she tried to "blow her off" during subsequent conversations. Prior to September 24, Bordeaux never saw or signed any affidavit provided by Jenkins.

Bordeaux testified that on September 24, 2016, she left her cell to take a shower. When she returned to the cell, Jenkins was the only other person there. Bordeaux sat down at the sink to brush her hair, when she saw Jenkins come up behind her. Jenkins pulled Bordeaux backward by her hair until she fell to the floor. While Bordeaux was on the ground, Jenkins started to punch her in the face and head. Bordeaux testified that she turned over onto her stomach to try to block the punches. At that point, she heard Fields enter into the cell. Fields began to kick her. Bordeaux believed that at some point during the assault, she lost consciousness. She testified that she awoke to the sound of a clicking noise, which she believed was a padlock. Jenkins then hit Bordeaux "multiple times in the head and the face again with the padlock." Bordeaux explained that Jenkins "put it, like, between her fingers, over her knuckles." She also stated, that at some point, the hits from the padlock felt different, with more of a "swaying motion and kind of a slower hit." Bordeaux denied that she ever saw Fields use the padlock to hit her. Bordeaux

testified that the assault lasted about 45 minutes. During this time, Jenkins remained in the cell with Bordeaux, but Fields moved in and out of the cell.

Jenkins eventually allowed Bordeaux to get up and instructed Fields to go get some ice. Bordeaux testified that Jenkins then told her: "'I'm sorry I had to do this to you. You — now you're going to act right. You're going to sign these papers. We're going to get this paperwork straightened out . . . .'"

When prison staff came to the cell a short while later, Bordeaux denied being assaulted and refused medical treatment. She testified that she went along with Jenkins' explanation that she had tripped over a "footlocker" and hit her face because Jenkins was still in the cell with her. Eventually, Bordeaux was removed from the cell in a wheelchair and transported to a hospital where she was diagnosed with a fracture to her nose and "left pinky" finger, with multiple contusions to her face and arms, and with a concussion. Photographs of Bordeaux's injuries which were admitted into evidence revealed that the bruises on Bordeaux's arms were in a circular shape, similar to that of a padlock.

Although Bordeaux told a nurse at the NCCW and a doctor at the emergency room that she had been assaulted, she did not immediately report that it was Jenkins who assaulted her. Despite Bordeaux's initial denial about the assault and about the perpetrators, Jenkins and Fields were taken to the restrictive housing unit shortly after the incident on September 24, 2016. Fields was evaluated by a nurse at the NCCW when she was taken to the restrictive housing unit. The nurse observed no signs of any injury on Fields. Fields did not indicate that she was in any pain or that she had any injuries. Jenkins refused the medical evaluation. Nine days after the incident, Bordeaux spoke with prison staff and reported that Jenkins had assaulted her.

Fields testified pursuant to a plea agreement with the State. In exchange for her truthful testimony, the State agreed to dismiss a pending charge of use of a weapon to commit a felony and an allegation that Fields was a habitual criminal.

Fields was to plead guilty or no contest to assault on a confined inmate. Based upon her participation in the plea agreement, Fields' possible punishment changed from up to 60 years' imprisonment (including a mandatory minimum of 10 years) to up to 20 years' imprisonment.

Fields testified that prior to September 24, 2016, she was acquainted with Jenkins and was aware that Jenkins was not happy with Bordeaux because Bordeaux had testified against her. Fields testified it is not good to be a "snitch." Fields knew that Jenkins had asked Bordeaux to sign an affidavit retracting her prior testimony so that Jenkins could receive a new trial. Even though Jenkins had asked for Bordeaux's cooperation, Fields had previously heard Jenkins say that she wanted to "beat [Bordeaux] up." When Jenkins moved into the same cell as Bordeaux, Jenkins told Fields that she could not sleep at night because she "wanted to do something to [Bordeaux]." To the contrary, Fields testified that she had no problems or disagreements with Bordeaux which would cause her to want to assault her.

While Bordeaux was in the shower on September 24, 2016, Jenkins and Fields discussed going to Bordeaux's cell in order to beat her up. Fields explained that at this time, she understood the conversation to be about a mutual fight between Jenkins and Bordeaux.

When Bordeaux returned to her cell from the shower, Fields observed Jenkins follow Bordeaux into their cell. When Fields arrived in the cell shortly thereafter, Jenkins was already hitting Bordeaux. Fields admitted that she kicked Bordeaux a few times in order to prove to Jenkins that she was going to help with the assault. Then, Fields left the cell in order to see where the guards were. Fields testified that Bordeaux was screaming very loudly, and Fields knew that she and Jenkins were going to get into trouble. When Fields returned to the cell, she observed Jenkins hitting Bordeaux with a padlock.

After the assault, Fields observed that Jenkins was cleaning up blood in the cell. Fields assisted by disposing of some bloody towels. Jenkins told Fields and Bordeaux that if

anyone asked about Bordeaux's injuries to say that Bordeaux had fallen. Ultimately, Fields was placed in restrictive housing along with Jenkins. After staying in restrictive housing for a week or two, Fields told investigators that Jenkins and Bordeaux had engaged in a mutual fight and Jenkins had only been defending herself. Fields explained that she was not initially forthcoming with investigators, because she was afraid of Jenkins. Eventually, however, she decided to cooperate with authorities and tell the truth about what happened.

Video surveillance of the common areas of the NCCW corroborates Bordeaux's and Fields' testimony about the assault. The video depicts Jenkins and Fields sitting at a table together when Bordeaux was in the shower. The video then shows Bordeaux returning from the shower and Jenkins following her into the cell. Fields follows Jenkins after a few moments, but it appears that she is looking around for the guards and prison staff as she walks. Fields goes in and out of the cell multiple times over the next hour, but Jenkins and Bordeaux remain in the cell for a significant period of time.

The defense's theory at trial, which was presented through cross-examination and through the testimony of other inmates, was that it was Fields who assaulted Bordeaux and not Jenkins. The defense offered evidence to demonstrate that Fields was a violent inmate. Specifically, Jenkins questioned Fields and prison staff regarding prior incidents of violence involving Fields. During her testimony, Fields admitted to struggling with "an anger problem." She also admitted to having previously assaulted another inmate using a cup. A prison employee concurred with Fields' account of the prior incident. She testified that she observed Fields strike another inmate with a plastic cup enough times to break the handle off of the cup. In addition, the employee testified that Fields had also hit the other inmate's head into a table during the altercation. An inmate who testified on Jenkins' behalf indicated that she was aware that Fields had "several conflicts with people that hung out with" Bordeaux.

Jenkins also attempted to show that Fields had a motive to assault Bordeaux due to a recent incident that occurred between Bordeaux and another inmate, Milea Ixta, in whom Fields had a romantic interest. A prison employee testified that on September 20, 2016, just 4 days before the incident in Bordeaux's cell, Bordeaux got into an argument with Ixta. Bordeaux exchanged words with Ixta and, apparently, threatened to harm her. When the prison employee intervened in the argument, he observed Bordeaux raise her fists at Ixta. Upon the employee's request, Bordeaux returned to her cell. The prison employee described this event as the type that happens frequently at the NCCW. He also testified that in his experience, he did not believe Bordeaux to be "an aggressive or assaultive type of person."

At the close of the evidence, the State made a motion to amend the information. The State wished to remove the words "'or dangerous'" from the definition of the weapon used by Jenkins during the assault, such that she was alleged to have used "a deadly weapon to intentionally, knowingly, or recklessly cause bodily injury to" Bordeaux. Jenkins did not object to the State's proposed amendment.

Ultimately, the jury convicted Jenkins of assault by a confined person. The jury found that a deadly weapon—the padlock—had been used during the commission of the assault. The jury found Jenkins not guilty of use of a deadly weapon to commit a felony.

Prior to sentencing, the district court found that Jenkins was a habitual criminal. As such, it sentenced her to 20 to 40 years' imprisonment, to be served consecutively to any other sentence she was currently serving.

Jenkins appeals from her conviction here.

### III. ASSIGNMENTS OF ERROR

On appeal, Jenkins assigns three errors by the district court. First, she asserts that the district court erred in overruling her motion for a mistrial after it was discovered that certain prospective jurors had discussed the case amongst themselves

during the jury selection process. Second, she asserts that the district court erred in permitting a prison employee to testify about statements she overheard Jenkins say to other inmates. Third, she asserts that the district court erred in withdrawing and revising the jury instruction regarding the elements of the charge of assault by a confined person after the instruction was given to the jury.

## IV. ANALYSIS

### 1. Motion for Mistrial

#### (a) Standard of Review

[1,2] An appellate court will not disturb a trial court's decision about whether to grant a motion for mistrial unless the court has abused its discretion. *State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

#### (b) Additional Background

During the jury selection process, a recess was taken so that certain jurors could be questioned individually regarding their prior knowledge of the case and of Jenkins. While these individuals were questioned one at a time in a different courtroom, the remainder of the potential jurors stayed in the jury room. The district court did not give the potential jurors any instructions prior to taking the recess and sending them to the jury room. During the individual questioning, it came to the parties' and to the court's attention that between two and four of the potential jurors in the jury room had discussed the case with each other. The exact content of the potential jurors' conversation is not entirely clear from our record. There was some indication that one of the potential jurors wondered aloud why they had to be there, since Jenkins was already incarcerated. There were other indications that the potential jurors involved in the conversation had already made up their minds regarding Jenkins' guilt. However, there was also some indication that

the jurors involved merely discussed certain facts surrounding the case: the "padlock in the sock" and the fact that the victim was one of Jenkins' relatives.

Once the court learned about the conversation in the jury room, it reassembled the potential jurors and specifically admonished them not to discuss the case with anyone, including each other. Further individual questioning completed by the parties revealed that at least two of the jurors were involved in the conversation about the case. These two jurors were struck for cause. In addition, the original juror who had reported the conversation was also struck from the panel for cause.

The individual questioning of the jurors continued. During this individual questioning, defense counsel asked some, but not all, of the potential jurors whether they had overheard the conversation in the jury room regarding the case. After the individual questioning had ended, Jenkins made a motion for a mistrial based upon the conversation between the potential jurors. She argued that the entire jury pool had been tainted by the comments. The State objected to the motion for a mistrial, arguing that the court's instructions would cure any potential issues. In addition, the State argued this was an isolated statement that most of the jurors indicated they did not overhear. Ultimately, the court agreed with the State and denied Jenkins' motion for a mistrial.

Of the individuals who were selected to sit on the jury, four were questioned individually, but never asked about the conversation in the jury room. One of the individuals selected for the jury was asked about the conversation, but denied hearing anything. Another individual selected was also asked about the conversation and indicated he did remember hearing someone wonder aloud why they had to be there when Jenkins was already incarcerated and probably guilty. Four individuals selected for the jury were never in the jury room and, as a result, did not overhear anything said. Three of the individuals selected for the jury were never questioned individually. All of the individuals selected for the jury specifically indicated that they were capable of deciding the case based upon

the evidence presented during the trial and that they would put aside any other information known to them in deciding Jenkins' guilt or innocence.

### (c) Analysis

On appeal, Jenkins argues that the district court erred in denying her motion for a mistrial because the "jury pool [was] tainted beyond repair" due to the inappropriate comments made in the jury room. Brief for appellant at 30. Upon our review, we cannot say that the district court abused its discretion in overruling Jenkins' motion for a mistrial.

[3] A criminal defendant claiming juror misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of juror misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. See *State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). Here, the record indicates that a few of the potential jurors engaged in a conversation among themselves regarding the facts of the case and Jenkins' guilt or innocence prior to deliberations. At the time this conversation occurred, the potential jurors had not been specifically admonished by the district court to not discuss the case with anyone, including each other. As a result, it is not entirely clear whether the jurors' actions should be referred to as "juror misconduct" or whether we should attribute the conversation between jurors as trial court error. See *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997). Although the parties were still in the process of selecting jurors and, as a result, no jury had been formally sworn in, the better, safer practice for the district court would have been to admonish the potential jurors to not discuss the case with anyone, including each other, prior to moving the potential jurors to the jury room to await individual questioning.

Here, we need not specifically decide whether the conversation between the potential jurors regarding the facts of the case and Jenkins' guilt or innocence prior to deliberations should be characterized as juror misconduct or as trial error. Under

either characterization, we conclude that the district court properly denied Jenkins' motion for a mistrial because Jenkins cannot demonstrate prejudice which denied her a fair trial.

The potential jurors who were directly identified as being a part of the conversation were struck for cause by the district court. Further, only one of the jurors who was actually seated on the jury indicated that he had overheard the conversation had by the struck jurors. That juror answered affirmatively when asked whether he would "be able to evaluate the guilt or innocence of [Jenkins] based on the evidence that is presented within the four walls of [the] courtroom." Of the remaining individuals seated on the jury, one of them denied hearing the conversation and four others were not in the jury room when the conversation occurred. The other six individuals seated on the jury were either not asked whether they heard the conversation when the parties questioned them individually or they were not individually questioned by the parties.

In her brief on appeal, Jenkins argues that because the district court failed to question all of the potential jurors about whether they overheard the conversation, there is a question about the extent that the jury was tainted. However, our record reveals that Jenkins' counsel chose not to question many of the potential jurors about the conversation despite having the opportunity to individually question the potential jurors after counsel learned of the conversation. Defense counsel was never denied the opportunity to ask the potential jurors about any potential biases, including about whether each juror had overheard the struck jurors' conversation. In fact, the district court gave defense counsel great latitude in questioning the jurors individually. Because Jenkins was given every opportunity to ask the potential jurors about whether they overheard the conversation, she cannot now argue that there is a lack of information in our record.

[4] Jenkins also questions whether the jurors who were asked about the conversation provided truthful information to the parties. We note that we do not reweigh the evidence or

resolve conflicts in the evidence, but, rather, recognize the trial court as the finder of fact and take into consideration that it observed the jurors when they testified. *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997). The district court clearly believed the jurors who testified that they had not overheard the conversation or who indicated that even if they had heard the conversation, it would not affect their ability to base a verdict on the evidence presented at trial. We do not question the district court's credibility determinations.

It does not appear based upon our reading of the record that the jury was "tainted beyond repair" as alleged by Jenkins. Brief for appellant at 30. Rather, we conclude, as did the district court, that the conversation between the struck jurors constituted isolated statements which, for the most part, went unheard by the other potential jurors. There is simply insufficient evidence to demonstrate that Jenkins was denied a fair trial due to the conversation between a few of the potential jurors. Because there was no apparent prejudice, we cannot find that the district court abused its discretion in denying Jenkins' motion for a mistrial.

## 2. Admissibility of Statements Overheard by Prison Staff

### (a) Standard of Review

[5] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation for an abuse of discretion. *State v. Ferguson*, 301 Neb. 697, 919 N.W.2d 863 (2018). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Ralios*, 301 Neb. 1027, 921 N.W.2d 362 (2019).

### (b) Additional Background

After Jenkins was moved to the restrictive housing unit as a result of her involvement in the assault of Bordeaux, a

corporal at the NCCW, Sherry Gragg, was assigned to work in the control room for that area. This was not Gragg's typical assignment. Normally, she worked in the visitation room, the kitchen, or in the yard at the NCCW. While working in the visitation room and the yard, Gragg became familiar with Jenkins and with Jenkins' voice. Gragg testified that Jenkins had a distinctive voice that she remembered.

On September 27, 2016, Gragg was filling in for another prison employee in the control room for the restrictive housing unit. While each inmate is housed in her own cell in the restrictive housing unit, the inmates can communicate with each other by yelling through the doors. As a part of Gragg's duties, she would turn speakers on in the hallway of the unit while another corporal would complete routine checks on the inmates. Gragg explained that when those speakers were turned on, she could hear what the inmates were saying to each other through their doors. During one such occasion when the speakers were turned on, Gragg overheard Jenkins discussing her conversation with a lieutenant at the NCCW regarding Bordeaux's having fallen down and being injured. Gragg heard Jenkins confirm that this is how Bordeaux got hurt before Jenkins stated, "'They should have let me finish the bitch off.'" Jenkins then began laughing.

Jenkins objected to Gragg's testimony regarding what she overheard Jenkins say through the restrictive housing unit's speakers. She asserted that the testimony lacked foundation because Gragg lacked the full context of the conversation. The State argued that the lack of complete context went to the weight of the statement and to Gragg's credibility, rather than to the testimony's admissibility. The court agreed with the State and overruled Jenkins' objection to the testimony. The court stated,

> All right. The Court has heard testimony that she recognizes the voice; that there are microphones that were operating. I believe sufficient foundation has been laid.

Your concerns that you've raised, [defense counsel], go to weight . . . you'll have an opportunity to cross-examine as to the context and accuracy.

(c) Analysis

On appeal, Jenkins asserts that the court erred by overruling her foundation objection and admitting the testimony into evidence. Specifically, she argues:

Because [Gragg] was not personally present for the conversation, not able to see the persons engaged in the conversation, and not aware of the details of how the microphone/speaker system worked, it was error for the [district] court to allow her to testify about a snippet of conversation she happened to overhear while intermittently monitoring sound from a hallway outside of [an] inmate cell for 5 to 10 minutes at a time each hour. Her testimony failed to show that the system upon which she relied worked in such a way that [Jenkins'] words could be put into proper context. This is no different than a party playing one brief sentence from an entire surveillance recording of a conversation on the basis that there would be no need to play the entire recording for the jury.

Brief for appellant at 36-37. Upon our review, we do not find that the district court erred in overruling Jenkins' objection to Gragg's testimony on foundational grounds.

At trial, Gragg testified that Jenkins was housed in the restrictive housing unit at the time Gragg overheard the statements about Bordeaux and her injuries. Gragg also testified that she had previously heard Jenkins' voice on multiple occasions and found it to be distinctive and memorable. Gragg testified that even though she could not see Jenkins, she knew that it was Jenkins whom she heard make the statements regarding Bordeaux. Gragg overheard the statements via a microphone and speaker system in the restrictive housing unit. She admitted that she did not know exactly how the system operated.

[6] Contrary to Jenkins' arguments on appeal, Gragg's knowledge of how the microphone and speaker system worked is not a foundational requirement for the admission of her testimony. Gragg testified that she was able to recognize Jenkins' voice and provided information about something that she personally overheard Jenkins say which was, arguably, pertinent to this case. Gragg's testimony was sufficient to provide the necessary foundation to admit the statements made by Jenkins. The Nebraska Supreme Court has

> long held that there is sufficient foundation to render communications by telephone admissible in evidence where the identity of the person with whom the witness spoke or the person whom he or she heard speak is satisfactorily established. And a witness testifying positively that he or she recognized, by voice, the person with whom he or she was talking, is generally sufficient to present the evidence to the jury to determine whether the conversation actually occurred.

*State v. Ferguson*, 301 Neb. 697, 717-18, 919 N.W.2d 863, 880 (2018). The Supreme Court has not required a witness testifying about a telephone call to understand precisely how the telephone system works. Similarly, Gragg was not required to understand exactly how the NCCW's speaker system worked in order to testify about comments she overheard Jenkins say to the other inmates in the restrictive housing unit.

In addition, we concur with the district court's finding that Gragg's inability to provide complete context for Jenkins' statements went to the weight and credibility of her testimony, not to its admissibility. In fact, we point out that during the cross-examination of Gragg, Jenkins' counsel fully questioned Gragg about her lack of knowledge regarding the context for Jenkins' statements. Gragg indicated that she had not heard any additional conversation regarding Bordeaux, nor did she know what precipitated Jenkins' comments or the conversation which came after Jenkins' comments. The jury was permitted to consider Gragg's lack of complete knowledge in determining the weight to give her testimony.

[7-9] Finally, we note that even if the district court abused its discretion in admitting Gragg's testimony about the statements she overheard Jenkins utter in the restrictive housing unit, such error would be harmless. The improper admission of evidence is a trial error and subject to harmless error review. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017). In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *Id*. Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. *Id*. Here, there was other competent evidence to support Jenkins' conviction for assault by a confined person. Bordeaux testified that it was Jenkins who assaulted her in their shared cell. Fields also testified that it was Jenkins who assaulted Bordeaux. The evidence also revealed that Jenkins had a motive to assault Bordeaux given that Jenkins was angry that Bordeaux had testified against her and was less than willing to retract that testimony.

Because we conclude that there was sufficient foundation for Gragg's testimony regarding the statements she overheard Jenkins make and because we find that any error in admitting such testimony was harmless, we affirm the decision of the district court to overrule Jenkins' foundational objection to Gragg's testimony.

### 3. REVISING JURY INSTRUCTION NO. 4 AFTER JURY'S DELIBERATIONS HAD BEGUN

#### (a) Standard of Review

[10-12] Whether jury instructions given by a trial court are correct is a question of law. *State v. Welch*, 275 Neb. 517, 747 N.W.2d 613 (2008). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *Id*. In an appeal based on a claim of an

erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id*.

### (b) Additional Background

Included in the court's original instructions to the jury was jury instruction No. 4, which delineated the elements of assault by a confined person as follows:

(1) Erica A. Jenkins

(2) In York County, Nebraska

(3) On or about September 24, 2016

(4) While confined in a jail or adult correctional facility or otherwise in legal custody of the Department of Correctional Services

(5) Used a deadly weapon

(6) To intentionally, knowingly, or recklessly

(7) Cause bodily injury to Christine Bordeaux

If you decide that the [S]tate proved each element beyond a reasonable doubt then you must find [Jenkins] guilty. Otherwise, you must find [Jenkins] not guilty.

During the jury's deliberations, it forwarded a question to the court. That question asked whether, "'On Count 1, did [Jenkins] have to use a deadly weapon?'"

In a discussion with the court about how to answer the jury's question, the parties disputed whether assault by a confined person was a lesser-included offense of assault by a confined person with a deadly weapon. Jenkins asserted that it was a lesser-included offense and that because the State had specifically charged Jenkins with using a deadly weapon to cause bodily injury to Bordeaux, that it would be unfair to allow Jenkins to be convicted of the lesser-included offense.

The State, on the other hand, argued that the use of a deadly weapon was not a required element for the commission of assault by a confined person as delineated in Neb. Rev. Stat. § 28-932(1) (Reissue 2016), which provides:

Any person (a)(i) who is legally confined in a jail or an adult correctional or penal institution, (ii) who

is otherwise in legal custody of the Department of Correctional Services, or (iii) who is committed as a dangerous sex offender under the Sex Offender Commitment Act and (b) who intentionally, knowingly, or recklessly causes bodily injury to another person shall be guilty of a Class IIIA felony, except that if a deadly or dangerous weapon is used to commit such assault, he or she shall be guilty of a Class IIA felony.

The State argued that whether a person used a deadly weapon as a part of the offense only affected the "level" of the offense. The State compared the statute to theft statutes which grade the offense based upon the value of the item stolen.

The court agreed with the State and revised jury instruction No. 4 as follows:

The elements of Assault by a Confined Person are:

(1) Erica A. Jenkins

(2) In York County, Nebraska

(3) On or about September 24, 2016

(4) While confined in a jail or adult correctional facility or otherwise in legal custody of the Department of Correctional Services

(5) Intentionally, knowingly, or recklessly

(6) Caused bodily injury to Christine Bordeaux

If you decide that the [S]tate proved each element beyond a reasonable doubt then you must find [Jenkins] guilty. Otherwise, you must find [Jenkins] not guilty.

If you find that the State proved each element beyond a reasonable doubt, then you must determine on the verdict form whether a deadly weapon was used beyond a reasonable doubt.

Shortly after the court revised jury instruction No. 4, the jury returned a verdict. The jury found Jenkins guilty of assault by a confined person and indicated that they also found, beyond a reasonable doubt, that a deadly weapon had been used to commit the offense. The jury returned a not guilty verdict on count II.

(c) Analysis

On appeal, Jenkins asserts that the district court erred in revising jury instruction No. 4 based upon the jury's question regarding whether the use of a deadly weapon was an element of assault by a confined person. Specifically, she asserts that the revised jury instruction permitted the jury to determine whether Jenkins committed a crime that she was not charged with in the information. Upon our review, we determine that to the extent the district court erred by revising the elements instruction after the jury had begun their deliberations, such error was ultimately harmless.

[13,14] In our analysis, we first must determine whether the use of a deadly weapon should be considered an element of the offense of assault by a confined person or whether it is to be considered a sentence enhancement factor. In *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), the U.S. Supreme Court held that any fact that increases the mandatory minimum sentence for a crime is an "element" of the crime and not a sentencing factor. Each element of an offense must be submitted to the jury. *Id*. The Court's holding in *Alleyne* expanded on its previous holding in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), where the Court articulated the constitutional principle that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In applying the rules articulated in *Alleyne* and *Apprendi* to the language of § 28-932(1), it is clear that the use of a deadly or dangerous weapon in the commission of assault by a confined person is an element of the offense which must be submitted to the jury and proved beyond a reasonable doubt. The use of a weapon increases the offense of assault by a confined person from a Class IIIA felony to a Class IIA felony.

The original jury instruction No. 4 which was submitted to the jury prior to the start of the deliberations clearly treated the use of a deadly weapon as an element of the offense of

assault by a confined person. The original jury instruction mirrored the language of the information and specifically listed the use of a deadly weapon as one of the seven elements the State had to have proved beyond a reasonable doubt before the jury could return a verdict of guilty. The revised jury instruction No. 4 removed the use of a weapon from the delineated list of elements for assault by a confined person. As such, the revised instruction only provided six elements which needed to be proved beyond a reasonable doubt in order for the jury to return a verdict of guilty. However, the revised instruction went on to inform the jury that if it found the State had proved each of the six delineated elements of assault by a confined person beyond a reasonable doubt, that it then must determine, beyond a reasonable doubt, whether a deadly weapon was used during the assault. As a result of this last directive, the revised jury instruction is not an incorrect statement of the law. It correctly informed the jury that it must find each element of assault by a confined person, including the use of a deadly weapon, beyond a reasonable doubt. The difference between the original instruction and the revised instruction is that the revised instruction permitted the jury to find Jenkins guilty of assault by a confined person, even if the jury found that Jenkins did not use a deadly weapon during the commission of the assault.

[15,16] Essentially, revised jury instruction No. 4 allowed the jury to convict Jenkins of a lesser-included offense, an option that was not available to them under the original instruction. See *State v. Al-Zubaidy*, 263 Neb. 595, 641 N.W.2d 362 (2002) (reiterating that test for determining whether crime is lesser-included offense is whether offense in question cannot be committed without committing lesser offense). In the information, the State did not charge Jenkins with the lesser-included offense. Instead, the State charged Jenkins only with assault by a confined person with a deadly weapon. We recognize that a trial court can, in certain circumstances, sua sponte instruct the jury on a lesser-included offense without the State's specifically alleging the lesser-included offense in

the information. See *State v. Pribil*, 224 Neb. 28, 395 N.W.2d 543 (1986). However, the defendant has to have been afforded fair notice of the lesser-included offense. *Id*. The nature of the crime charged in the information can provide the defendant with notice that he or she could face a lesser-included offense charge. See *State v. James*, 265 Neb. 243, 655 N.W.2d 891 (2003).

Here, the district court instructed the jury on the lesser-included offense only after the jury had begun its deliberations. We question whether the district court's action provided Jenkins with proper notice or a chance to timely object to including the lesser-included offense in the jury instructions. We have found no Nebraska case law in which a trial court has added a lesser-included offense charge to the jury instructions after the deliberations have begun.

[17,18] Ultimately, however, we need not decide the correctness of the district court's decision to revise the elements instruction mid-deliberations, because we find that any error in the court's action was harmless. Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party. *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019). Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id*.

After the jury received revised jury instruction No. 4, it found Jenkins guilty of assault by a confined person. It then found, beyond a reasonable doubt, that a deadly weapon was used during the assault. Accordingly, the jury convicted Jenkins of the exact offense the State charged her with in the information. Jenkins cannot show she was prejudiced in any way by the submission of revised jury instruction No. 4 during the jury's deliberations.

In her brief on appeal, Jenkins argues that, she was, in fact, prejudiced by the submission of revised jury instruction No. 4 due to the effect that revised jury instruction No. 4 had on another jury instruction, namely jury instruction No. 13. Jury instruction No. 13 permitted the jury to consider whether Jenkins was guilty of aiding and abetting the assault of Bordeaux. Jury instruction No. 13 read as follows:

> 1. [Jenkins] can be guilty of Assault by a Confined Person even though she personally did not commit every act involved in the crime so long as she aided someone else to commit it. [Jenkins] aided someone else if:
>
> a. [Jenkins] intentionally encouraged or intentionally helped another person to commit the crime of Assault by a Confined Person; and
>
> b. [Jenkins] intended that an Assault by a Confined Person be committed; or [Jenkins] knew that someone else intended to commit an Assault by a Confined Person; and
>
> c. The Assault by a Confined Person in fact was committed by that other person.

Essentially, Jenkins argues that revised jury instruction No. 4 in conjunction with jury instruction No. 13 permitted the jury to find that "Jenkins committed an assault by a confined person without a deadly weapon but had to be convicted of assault by a confined person with a deadly or dangerous weapon merely because [the jury believed that the actual perpetrator,] Fields[,] used a deadly or dangerous weapon." Brief for appellant at 42 (emphasis omitted).

We do not agree with Jenkins' interpretation of the effect of revised jury instruction No. 4 on jury instruction No. 13. Specifically, we do not find that the revisions to jury instruction No. 4 materially or necessarily altered the jury's consideration of the aiding and abetting instruction. Assuming that the jury found that Jenkins was guilty of aiding and abetting the assault of Bordeaux, as Jenkins suggests in her brief to this court, the jury had to find beyond a reasonable doubt that a weapon was used during the commission of the assault.

As such, even under a theory of aiding and abetting, the jury could have found Jenkins guilty of the greater offense of assault by a confined person with a deadly weapon. This result could be reached under either the original or the revised version of jury instruction No. 4.

We conclude that any error by the district court in revising jury instruction No. 4 after the jury had begun deliberating was harmless because the jury ultimately convicted Jenkins of the offense she was charged with in the information.

## V. CONCLUSION

We affirm Jenkins' conviction for assault by a confined person with a deadly weapon. The district court did not err in overruling Jenkins' motion for a mistrial made during the jury selection process. The court also did not err in permitting a prison employee to testify regarding statements the employee overheard Jenkins make in her cell in the restrictive housing unit. Finally, we find that any error the district court committed in revising jury instruction No. 4 during the jury's deliberations was harmless.

AFFIRMED.